UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


EDWARD C. SCHOETTLE,       )
                           )
      Plaintiff,           )
                           )
    vs.                  )        Case No. 4:12-CV-2075-SPM
                           )
JEFFERSON COUNTY, MO. ET AL.,   )
                           )
      Defendants.       )


### MEMORANDUM AND ORDER

This matter is before the Court on Defendants' motion for summary judgment on all counts. (Doc. 50).[1] For the following reasons, the Court will grant Defendants' motion.

### I.    BACKGROUND

Plaintiff Edward C. Schoettle ("Plaintiff") is an insulin-dependent diabetic who was injured on the evening of November 6, 2010, when two Jefferson County police officers, suspecting that Plaintiff was driving while intoxicated, forcibly removed Plaintiff from his vehicle and detained him. The officers' suspicions turned out to be erroneous, and Plaintiff filed suit against the officers, the sheriff of Jefferson County, and Jefferson County. Plaintiff asserts claims under 42 U.S.C. § 1983 and state law; more particularly, he alleges that the officers (Deputy Matthew Hudson and Deputy Aaron Peifer) used excessive force and deliberately disregarded his serious medical needs, in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution and state law. Plaintiff also alleges counts of municipal and supervisory liability against Jefferson County and its sheriff (Sherriff Oliver

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 14).

"Glenn" Boyer), claiming that they violated his constitutional rights by failing to properly train, supervise, and/or control their officers.

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.* at 324. "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano,* ——U.S. ——, 129 S.Ct. 2658, 2677 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007) (internal quotations omitted). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).

## III.    FACTS[2]

Plaintiff is an insulin-dependent diabetic. On the evening of November 6, 2010, Plaintiff was driving his truck northbound on Highway 61/67 in Jefferson County, Missouri, when he began experiencing a hypoglycemic episode. He felt lightheaded and had vision problems, and he pulled over to the side of the road and stopped his vehicle on the shoulder of the highway. He

---

[2] These facts are taken from the Defendants' Statement of Uncontroverted Material Facts (Doc. 52) and the Plaintiff's Response thereto (Doc. 68), unless otherwise indicated.

turned the engine off but left the radio on. (Pl's. Dep. at 61). He ate some candy and glucose tablets then lay down in the cab of his truck to allow his blood sugar to rise. He then fell asleep or became "near unconscious." When Plaintiff's blood sugar got low, he could become "uncooperative," "disoriented," and "combative."

Deputy Matthew Hudson ("Deputy Hudson") of the Jefferson County Sheriff's Office received a dispatch call of an abandoned vehicle in the area of Douglas Drive and northbound 61/67 that was reportedly partially blocking the roadway.[3] Deputy Hudson arrived at the scene, approached Plaintiff's truck, and noticed Plaintiff "slumped" and "slouched to the side," apparently sleeping in the truck. Deputy Hudson knocked on the window and tried to identify himself. Plaintiff heard a knock on the window and recognized that it was an officer, but he did not know what jurisdiction the officer was from or who the officer was. (Pl's. Dep. at p. 67). Plaintiff recalls that he rolled down the window and told the officer his sugar was low and he was eating candy to recover, that the officer walked back to his vehicle and drove away, and that Plaintiff rolled his window back up. (Pl's. Dep. at pp. 67-68).[4] Deputy Hudson testified that he heard only that Plaintiff "mumbled" something and then Plaintiff went back to sleep. (Hudson's

---

[3] The parties dispute whether the vehicle was parked entirely on the shoulder or was blocking the roadway. However, for purposes of their motion, Defendants accept Plaintiff's testimony that his vehicle was not blocking the roadway.

[4] Defendants argue that because Plaintiff did not know the identity of the first officer he talked to and testified that he remembered the officer driving away (which Deputy Hudson apparently did not do), Plaintiff's own testimony demonstrates that his first encounter with an officer could not have been with Deputy Hudson. I disagree. It is possible that the first interaction Plaintiff described was with some unknown officer from a different jurisdiction who drove away, and then Plaintiff had no memory whatsoever of the incident in which Deputy Hudson knocked on his window and Plaintiff spoke to him. However, it is equally possible that Plaintiff's initial interaction was with Deputy Hudson, but Plaintiff mistakenly believed that Deputy Hudson had driven away when he had, in fact, only walked away and gotten in his vehicle. At the summary judgment stage, I must view the facts in the light most favorable to Plaintiff and assume that Plaintiff's initial interaction was with Deputy Hudson. *See, e.g.*, *Ellis v. Houston*, 742 F.3d 307, 312 (8th Cir. 2014).

Dep. at p. 36). Deputy Hudson did not see any open alcohol containers or weapons, Plaintiff's clothing did not appear disheveled, and it did not appear that he had thrown up. (Hudson's Dep. at pp. 34-36). Believing that Plaintiff was intoxicated, Deputy Hudson returned to his vehicle and radioed for a DWI enforcement officer.

Deputy Aaron Peifer ("Deputy Peifer"), a DWI enforcement officer with the Jefferson County Sheriff's Office, responded and arrived at the scene. Deputy Peifer knocked on Plaintiff's truck's window, and Plaintiff woke up and stated, "Who the fuck are you?" Plaintiff then rolled down his window and recognized that the person standing there was a law enforcement officer. Plaintiff said, "Leave me the fuck alone." Deputy Peifer twice requested that Plaintiff exit his vehicle, but Plaintiff refused the requests. In response to one request, he stated, "I got no reason to get out, mother fucker, because I've done nothing wrong." Plaintiff rolled his window back up and lay down again. During this interaction, Deputy Peifer did not see any alcohol containers or weapons. (Peifer's Dep. at pp. 25-26).

Deputy Peifer opened Plaintiff's door to remove Plaintiff from the vehicle, and Plaintiff drew back into the passenger side of the vehicle to avoid him and Deputy Hudson. (Hudson's Dep. at p. 44; Peifer's Dep. at pp. 31-32). Each deputy grabbed one of Plaintiff's legs, and they pulled Plaintiff from the truck. Plaintiff "hit the ground," "rolled over," and "started to stand up," when a deputy grabbed his right arm. Plaintiff heard one of the officers order him to put his hand behind his back, and Plaintiff said "no." Plaintiff broke free of one of the officers by "pushing away with [his] free leg to get [the deputy] off." Plaintiff managed to stand up and tried to move back toward the truck while one deputy was holding his right arm.

Plaintiff testified that he told Deputy Peifer he was diabetic "as soon as [he] got on his feet outside the [truck door]"; however, it is somewhat unclear when this occurred. (Pl's. Dep.

at. p. 80).[5]  Plaintiff resisted being handcuffed, and the officers forcibly placed him on the ground on his stomach.  While the officers were trying to pull his arm behind his back to handcuff him, Plaintiff told them that he did not want to put his hands behind his back because he had a gun in his waistband.  Deputy Peifer removed the gun from Plaintiff's waistband and threw it away from Plaintiff, toward the truck.  Plaintiff "became more agitated" at this point because he was concerned that the gun could have gone off, and he asked the officers if they were "stupid."

Plaintiff testified that he thought one of the officers said something about being under arrest.  Around this time, Plaintiff said something like, "I haven't done anything, call an ambulance, check my sugar."  (Pl's. Dep. at 83).  The officers continued to try to handcuff Plaintiff, and Plaintiff continued to struggle and resist.  (Pl's. Dep. at pp. 84-85).  The officers sprayed Plaintiff with pepper spray, which Plaintiff testified had no effect on him.  (Pl's. Dep. at p. 99).  They also used physical strikes to attempt to subdue Plaintiff, including knee strikes, kicks, and punches to Plaintiff's head and body.  Following the officers' use of pepper spray, Plaintiff was also kicking and punching at the officers from the ground.  (Pl's. Dep. at pp. 86-88).  At some point during the struggle, Deputy Peifer struck Plaintiff twice in the leg, twice in the face, and once in the abdomen.  (Doc. 68-6, Peifer's Police Report, at p. 4).  After that, the officers were able to get one handcuff on him and to hold him down until additional deputies arrived at the scene, at which point he was fully handcuffed.  (Peifer's Police Report, at pp. 4-5).

---

[5] Plaintiff's own testimony is somewhat conflicting regarding the point(s) at which he told the officers that he was having a low blood sugar or diabetic episode.  At one point in his deposition, he indicated that he thought that being pepper-sprayed was the "catalyst" for him telling the officers about his low blood sugar.  (Pl's. Dep. at pp. 85-86).  However, at earlier points in his deposition, he indicated that he told the officers earlier in the encounter.  (Pl's. Dep. at pp. 80, 83).  The Court presents the facts in the light most favorable to Plaintiff, the nonmoving party.

EMS was called as soon as the officers were able to gain sufficient control of Plaintiff to allow them to call for EMS. Plaintiff continued resisting and "retaliating" until the ambulance arrived. EMS personnel noted that Plaintiff was "very uncooperative" and "would answer few questions." They treated Plaintiff for a nosebleed and hypoglycemia; after being treated for hypoglycemia, Plaintiff became calm. Plaintiff was transferred by ambulance to St. Anthony's Medical Center for treatment. At the hospital, Plaintiff agreed to provide a blood sample, and a blood alcohol content test was negative. Plaintiff left the hospital that night, not in custody. A trip to a second hospital the next day revealed that Plaintiff had sustained a broken posterior rib. (Pl's. Dep. at p. 105).

## IV. DISCUSSION

In his Amended Complaint, Plaintiff alleges five counts: (I) a claim that Deputy Hudson and Deputy Peifer used excessive force against him; (II) a claim that Deputy Hudson and Deputy Peifer deliberately disregarded his serious medical needs; (III) a supervisory liability claim against Sheriff Boyer, alleging that Sheriff Boyer failed to supervise, train, instruct, discipline, or control the deputies; (IV) a municipal liability claim against Jefferson County, alleging that it failed to supervise, train, instruct, discipline, or control the deputies and that its policies, practices, or customs led to the deprivation of his rights by the deputies; and (V) an assault and battery claim against Deputy Hudson and Deputy Peifer. Counts I through IV are brought under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments, and Count V is brought under state law.

Defendants have moved for summary judgment on all five counts in the Amended Complaint. The Court considers each count below.

**A. SECTION 1983 CLAIMS AGAINST DEFENDANTS PEIFER AND HUDSON (COUNTS I AND II)**

Deputy Hudson and Deputy Peifer first argue that they are entitled to qualified immunity on the excessive force and deliberate disregard of medical needs claims brought against them under § 1983. For § 1983 claims, "qualified immunity shields government officials from liability and the burden of litigation unless their conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." *Carpenter v. Gage*, 686 F.3d 644, 648 (8th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine of qualified immunity "'allows officers to make reasonable errors so that they do not always err on the side of caution for fear of being sued.'" *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008) (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996). It "provides 'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). "To overcome the [officers'] assertion of qualified immunity, [the plaintiff] must produce sufficient evidence to create a genuine issue of fact as to whether they violated a clearly established right." *Carpenter*, 686 F.3d at 648.

**1.      Excessive Force Claim (Count I)**

As the parties acknowledge, the right to be free from excessive force in the context of an arrest or investigatory stop is clearly established under the Fourth Amendment's prohibition against unreasonable seizure. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Alleged violations of this right are analyzed under the Fourth Amendment's standard of "objective reasonableness." *Id.*; *Ngo v. Storile*, 495 F.3d 597, 602 (8th Cir. 2007). In evaluating whether a particular use of force is reasonable, the Court should consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Ngo*, 495 F.3d at 602. The reasonableness of the officers' actions must be evaluated "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. In addition, the reasonableness of force used is examined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In their motion, Deputy Hudson and Deputy Peifer argue that they are entitled to qualified immunity because—even accepting Plaintiff's version of events—they used only that level of force that was necessary and reasonable under the circumstances. They emphasize that they escalated their use of force only when their attempts at soft-hand control were unsuccessful. In his response, Plaintiff argues that that there are genuine issues of fact regarding several matters material to the excessive force claim: (a) whether the officers had reasonable suspicion sufficient to justify requiring Plaintiff to exit his vehicle; (b) the extent to which Plaintiff resisted the officers during the encounter and whether that resistance justified the level of force used; and (c) whether, and when, the officers knew or should have known that Plaintiff was experiencing a serious medical emergency. The Court considers each of these arguments below.

a. *Reasonable Suspicion to Justify Requiring Plaintiff to Exit his Truck*

Plaintiff argues that summary judgment should not be granted on his excessive force claim because of genuine issues of material fact regarding whether the officers had reasonable suspicion to detain him and require him to exit his vehicle. "A police officer may conduct a

brief, investigatory stop of an individual if the officer reasonably suspects that the individual is involved in criminal activity." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Reasonable suspicion must be based on specific, articulable facts. *Id.* In determining whether an officer had reasonable suspicion based on specific, articulable facts, the Court "'look[s] at the totality of the circumstances, allowing officers to draw on their experience and training.'" *Id.* (quoting *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008)). "Reasonable suspicion does not require 'absolute certainty'; rather, an officer must observe 'unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *Id.* at 821 (quoting *Terry*, 392 U.S. at 27).

Deputy Hudson and Deputy Peifer contend that they had a reasonable suspicion that Plaintiff had been driving while intoxicated before they ordered Plaintiff to exit his truck.[6] After reviewing the facts as a whole in the light most favorable to Plaintiff, from the perspective of a

---

[6] The Court does not accept Defendants' alternative argument that because Plaintiff's truck was already stopped, the deputies did not need to have reasonable suspicion that Plaintiff had violated the law in order to require him to get out of his vehicle. *See* Def's. Reply Brief, Doc. 69, at pp. 2-3 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109-10 (1977), and *Maryland v. Wilson*, 519 U.S. 408 (1997)). In *Mimms* and *Wilson*, the Supreme Court determined that once a motor vehicle has been lawfully detained for a traffic violation, the *additional intrusion* on liberty of ordering a driver or passenger out of a vehicle is *de minimis* and is justified in light of legitimate concerns about officer safety. *Mimms* and *Wilson* do not support the proposition that an officer has a right to walk up to any parked vehicle and, without any reason, order the occupants to exit the vehicle. Indeed, the Eighth Circuit and this court have indicated that reasonable suspicion is required when an officer demands that the occupants of a parked car exit their vehicle. *See United States v. Barry*, 394 F.3d 1070, 1075-78 (8th Cir. 2005) (noting, in a case involving officers approaching a suspect in a parked vehicle, that the [suspect] "was not seized until [the officer] asked [the suspect] to exit the vehicle," by which point the officers had reasonable suspicion to detain the suspect); *United States v. Carter*, No. 4:07CR270 HEA, 2008 WL 681688, at *8 (E.D. Mo. March 6, 2008) (holding that when an officer approached a parked vehicle, the defendant was "detained . . . when [the officer] ordered in a loud voice for the defendant to show his hands and step out of the vehicle"; analyzing whether the surrounding circumstances showed that the officer had reasonable suspicion).

reasonable officer on the scene, the Court agrees. Plaintiff's truck was stopped on the shoulder of the highway, and Deputy Hudson observed that Plaintiff was either asleep or passed out in the truck. When Deputy Hudson knocked on the window, he heard Plaintiff "mumble" something, after which Plaintiff went back to sleep. When Deputy Peifer knocked on the window, Plaintiff was belligerent and hostile and repeatedly cursed at him. According to the facts submitted by Plaintiff, Plaintiff becomes "disoriented" and "combative" when having a diabetic episode, and he alleges in his complaint that he was "confused" and "disoriented" during his encounters with the officers. (Plaintiff's First Amended Complaint, ¶¶ 16, 29).

From these facts, it was reasonable for the officers to conclude, in light of their training and experience, that Plaintiff had been driving under the influence of alcohol or some other substance, even though they had not seen him driving and had not smelled alcohol or observed certain other signs of alcohol use.[7] *See United States v. Broadie*, 452 F.3d 875, 879 (8th Cir. 2006) (reasonable suspicion existed to justify officers ordering suspect to get out of his van where the suspect was found "slumped over" his steering wheel, late at night, with his engine running, and was slow to awaken, disoriented, and confused; noting, "generally people are not found in such a position unless something is amiss"); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1021 (9th Cir. 2009) (reasonable suspicion existed to justify officer ordering a suspect out of his car where the suspect was asleep at the wheel of his car at 8:00 p.m. in a drugstore parking lot, was breathing quickly while sleeping, and gave a "testy" response when the officer tapped on

---

[7] Defendants also argue in their reply brief that they had reasonable suspicion and probable cause to believe that Plaintiff was in violation of Jefferson County Traffic Code, Sec. 320.050, which prohibits parking "upon any unpaved shoulder or other unpaved portion of the right-of-way" or "upon any portion of the right-of-way of any controlled or limited access highway." However, Plaintiff testified that he was properly parked on the shoulder of the highway, and Defendants point to no evidence suggesting that the highway in question was a "controlled or limited access highway" or had an "unpaved" shoulder.

his window); *United States v. Neeman*, 61 F. Supp.2d 944, 953 (D. Neb. 1999) (officer had reasonable suspicion to detain a suspect in a parked car to determine whether he had been driving while intoxicated where the individual was asleep behind the steering wheel of the car, the rear of the car was protruding excessively out into the street, and the suspect's eyes were watery and bloodshot).

In addition, once the officers had reasonable suspicion to justify an investigative stop, it was proper for them to order Plaintiff to exit the vehicle. *See United States v. Phillips*, 679 F.3d 995, 998 (8th Cir. 2012) ("During a lawful investigative stop, an officer may order a passenger to exit the vehicle."); *United States v. Carter*, No. 4:07CR270 HEA, 2008 WL 681688, at *9 (March 6, 2008) ("During an investigative detention of a person driving an automobile, an officer may order the driver to step out of the vehicle.") (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). *Cf. United States v. Robinson*, 670 F.3d 874, 877 (8th Cir. 2012) ("It is well established . . . that police officers may handcuff a suspect and place him in a patrol car during an investigative stop in order to protect their safety and the status quo.").

Plaintiff suggests that no reasonable suspicion existed because of his statement to Deputy Hudson that he was diabetic when Deputy Hudson first knocked on the door.[8]  However, Deputy Hudson's uncontroverted testimony indicates that he heard only that Plaintiff "mumbled" something during this interaction.  Moreover, even assuming *arguendo* that Deputy Hudson heard Plaintiff's statement, that statement alone cannot establish a lack of reasonable suspicion in light of the totality of the circumstances.  First, the officers were not required to simply accept Plaintiff's explanation without consideration of the other circumstances.  *See Ramirez*, 560 F.3d

---

[8] Plaintiff also notes that his truck contained glucose tablets and candy and that Plaintiff normally wears or carries a diabetic-alert bracelet.  However, there is no evidence that the glucose tablets, candy, or diabetic-alert bracelet were visible to the officers.

at 1024 ("[I]n considering the totality of the circumstances, [the suspect's] innocent explanations for his odd behavior cannot eliminate the suspicious facts from the probable cause calculus. Rarely will a suspect fail to proffer an innocent explanation for his suspicious behavior.").  In addition, after Plaintiff made the statement, Plaintiff continued to exhibit suspicious behavior: when Deputy Peifer approached Plaintiff, Plaintiff did not explain his situation or ask for assistance, but rather repeatedly cursed at him.  In sum, viewing the facts in the light most favorable to Plaintiff but from the perspective of a reasonable officer on the scene, the officers had reasonable suspicion sufficient to justify conducting an investigative detention of Plaintiff and ordering him to exit his truck. [9]

---

[9] Independent of any reasonable suspicion that Plaintiff had committed a crime, Defendants may have been justified in removing Plaintiff from behind the wheel of his truck under their "community caretaking" function.  In *Cady v. Dombrowski*, 413 U.S. 433 (1973), the Supreme Court recognized that law enforcement officers are frequently involved in activities that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  *Id.* at 441.  The Court described these activities as "community caretaking functions."  *Id.*  In *Winters v. Adams*, 254 F.3d 758 (8th Cir. 2001), officers responded to a complaint of an individual who appeared to be intoxicated exiting and re-entering a parked car on a dead-end street and arrived and observed the person seated behind the wheel of the car; they questioned the individual and found him uncooperative, agitated, and sweating.  *Id.* at 760-61.  Although they had observed no illegal activity, they broke his window and forcibly removed him from the car, eventually punching him in the eye after he violently resisted their efforts.  *Id.* at 762.  Relying on *Cady* and other community caretaking cases, the Eighth Circuit upheld summary judgment in favor of the officers on the individual's wrongful detention and excessive force claims, stating:

> In the instant case, the [individual] argues that the police officers were required simply to walk away from [the individual's] vehicle, thus perhaps permitting a possibly intoxicated individual to drive the vehicle, potentially harming himself and other citizens.  The Court simply cannot conclude that the strictures of *Terry* and its progeny compel such a result.  . . .  [T]his Court finds that [the officers] "would have been derelict in their duties" had they not detained [the individual].

*Id.* at 764 (footnotes and citations omitted).

*b. Level of Resistance From Plaintiff and Level of Force Used by the Officers*

Plaintiff's second argument is that there are genuine issues of material fact regarding the level of resistance Plaintiff showed throughout the incident and whether that resistance justified the level of force used by the officers. Plaintiff argues that his resistance was "passive" until after he was pepper-sprayed, and his passive resistance could not justify the amount of force against him.

The Court finds that, even accepting Plaintiff's account of the level of resistance he showed throughout the incident, the force the officers used in removing Plaintiff from the vehicle and attempting to subdue Plaintiff was objectively reasonable in light of the circumstances. *See Graham*, 490 U.S. at 396 (noting that courts should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). With respect to the first *Graham* factor, the Eighth Circuit has found the use of significant force to be reasonable in dealing with an DWI suspect, at least where other factors render the use of that force reasonable. *See Wertish v. Krueger*, 433 F. 3d 1063, 1066-67 (8th Cir. 2006). Moreover, both the second and third *Graham* factors strongly support the officers' actions in this case, because the evidence shows that Plaintiff posed a threat to the safety of the officers and others and that Plaintiff was actively resisting their attempts to subdue him.

At the time when Plaintiff refused to exit his truck, a reasonable officer in Deputy Hudson and Deputy Peifer's position would have recognized the threat posed to them and to the public by leaving an undisputedly impaired and belligerent person behind the wheel of a vehicle on a public roadway. Thus, it was reasonable for them to forcibly remove him from the truck. *See Janis v. Biesheuvel*, 428 F.3d 795, 800 (8th Cir. 2005) (holding that once a driver suspected

of driving while intoxicated was stopped and failed to follow an order to exit his vehicle, "the officers were justified in using force to remove him, particularly given the potential threat to public safety of an impaired driver in command of a running vehicle" (internal quotation marks omitted)); *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) (holding that officers reasonably used force to remove a driver they reasonably suspected was intoxicated; noting that the impaired driver posed a threat to himself, the officers, and the general public, even after the officers had turned off the vehicle). Moreover, the officers had no way of knowing whether Plaintiff, who was admittedly impaired and was hostile to them, was carrying a weapon either on his person or in his truck. *See Holtgreven v. O'Fallon Police Dep't*, No. 408CV0053 ERW, 2009 WL 2032164, at *9 (E.D. Mo. July 8, 2009) (considering the fact that "the officers did not know if [the plaintiff] was carrying a weapon of any sort" in analyzing an excessive force claim); *Janis*, 428 F.3d at 800 (considering, among other factors, the fact that the officers did not know "what level of risk [the plaintiff] posed (i.e., whether he possessed a weapon)" in analyzing an excessive force claim).

In addition, Plaintiff's continuous and escalating physical resistance throughout the encounter necessitated the officers' own escalating use of force. Plaintiff suggests that until he was pepper sprayed, his resistance was only "passive." However, even where resistance is only passive, some force may be used. *See Wertish*, 433 F.3d at 1066-67 ("When a suspect is passively resistant, somewhat more force may reasonably be required."). In addition, although Plaintiff characterizes his resistance as "passive" until after he was pepper-sprayed, his own testimony indicates that he was actively resisting and struggling against the officers as soon as they pulled him from the truck. Plaintiff admits that shortly after being pulled from the truck, he broke free of one of the officers by "pushing away with [his] free leg to get [the officer] off" and

then tried to move back toward his truck. Plaintiff admits that throughout the encounter, he struggled against the officers and refused to permit them to handcuff him. In light of this resistance, it was reasonable for the officers to use force to attempt to handcuff him, including pepper spray and other force. *See Wertish*, 433 F.3d at 1067 (finding no excessive force was used where a suspected drunk driver refused to exit a car, the officers pulled him from the car and took him to the ground, an officer climbed on top of him and tried to handcuff him, the driver ignored commands to place his hands behind his back, the officers forcibly twisted the driver's arms behind his back and cuffed him, and at some point in the encounter an officer struck the driver in the back of the head with his elbow and hit him in the ribs with his knee); *Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012) (upholding a grant of summary judgment on an excessive force claim where an individual refused to offer his hands for handcuffing and attempted to lift himself off of the floor, and the officers used a taser against him; reasoning, "the deputies on the scene reasonably could have interpreted [the suspect's] actions as resistance and responded with the amount of force that was reasonable to effect the arrest"). Plaintiff further admits that after he was pepper-sprayed, he began kicking and punching at the officers; this active aggression from Plaintiff made it reasonable for the officers to further escalate their use of force, including additional hand, knee, and/or foot strikes. *See Holtgreven*, 2009 WL 2032164, at *5 (finding no excessive force and granting summary judgment in favor of defendant officers where the officers pulled a suspected drunk driver out of a vehicle and took him to the ground, the plaintiff was combative with the officers and struck one of them, and the officers used tasers several times to attempt to subdue him).

It is apparent that the officers here used only that level of force that was reasonably necessary, given that they were dealing with an evolving situation involving a suspect who posed

a threat to them and the public and who was making increasing efforts to resist them. *See Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). There is no evidence that the officers used any gratuitous force against Plaintiff once he was under sufficient control to allow them to call an ambulance.

   c.   *Whether and When the Officers Knew Plaintiff Was Experiencing a Medical Emergency*

   Plaintiff also argues that a genuine issue of material fact exists regarding when in the encounter he told the officers about his low blood sugar; he suggests that if he did so early in the encounter (as he testified), the officers' use of force was unreasonable and excessive. The officers' awareness that Plaintiff was having a low blood sugar episode may weigh against the reasonableness of their use of force. *See Janis*, 428 F.3d at 800 (upholding summary judgment in favor of officers who used force against a diabetic individual suspected of being intoxicated; reasoning in part that the officers did not know that the plaintiff's actions were the result of diabetes rather than intoxication); *Wertish*, 433 F.3d at 1067 (same). However, given all of the rest of the undisputed facts present in this case, the officers' awareness of Plaintiff's low blood sugar condition is not sufficient to permit a finding that the force used was excessive. The officers were dealing with an impaired individual who was behind the wheel of a truck (and who, once removed, tried to move back toward his truck), who was belligerent and cursing at them, who consistently refused to follow their instructions, and who physically struggled against their attempts to subdue him. Even if they knew that his actions were the result of hypoglycemia, it was reasonable for them to subdue Plaintiff and stabilize the situation before attempting to obtain medical treatment. *See Carpenter*, 686 F.3d at 647-50 (finding that officers' use of a taser to

subdue a suspect who was resisting being handcuffed was reasonable even though the officers had been told that he might have had a stroke; noting in another part of the analysis that "[b]efore the deputies could consider responding to [the plaintiff's] medical needs, they had to subdue him and secure the premises").

In sum, there are no genuine issues of material fact that preclude summary judgment on this claim. The cases cited by Plaintiff in which the court found genuine issues of material fact are easily distinguishable from the present case. In *Cunningham v. Hinrichs*, No. 4:12-CV-785, 2013 WL 6068881, at *1, *3 (E.D. Mo. Nov. 18, 2013), the plaintiff testified that even though he obeyed all of the officers' orders and made no attempt to retreat, flee, or resist, the officers threw him down, pinned him to the ground, sat on him, forcibly handcuffed him, and told him to "shut up" when he said that he could not breathe. In contrast, the officers testified that the plaintiff refused to comply with their orders and walked away from him, and they stated that they did not physically force him to the ground. *Id.* The court found that given these factual disputes, it could not determine as a matter of law whether the force used was objectively reasonable. *Id.* at *3. *See also McDowell v. Blankenship*, No. 4:08-CV-602 SNLJ, 2012 WL 3095520, at *7-*8 (E.D. Mo. July 30, 2012) (holding that a genuine dispute of material fact precluded summary judgment on an excessive force claim where the officers testified that the plaintiff failed to comply with their commands and struggled and resisted arrest until he was finally handcuffed, but the plaintiff pointed to evidence that he did not resist arrest or struggle in any way and attempted to comply with the officers' demands).[10]

_____

[10] Plaintiff also argues that there are factual similarities between this case and the Supreme Court's decision establishing the standards for excessive force claims. *See Graham*, 490 U.S. 386. However, the Court in *Graham* did not draw any conclusions based on the facts of the case before it; it merely held that remand was required because the lower court had applied an incorrect standard. *Id.* at 398-99.

This is not a case where the jury must decide between one version of events in which the plaintiff was struggling and resisting and another version in which the plaintiff was calm and compliant. Plaintiff's own testimony indicates that he was not compliant with the officers' orders and consistently tried to get away from them, struggled against them, and resisted their attempts to subdue him, eventually kicking and punching at them. Even accepting Plaintiff's version of events, the officers' actions were reasonable.

Based on the above, the Court finds that there are no genuine issues of material fact and that the officers' use of force was reasonable as a matter of law. Thus, the officers did not violate Plaintiff's constitutional right to be free from excessive force, and the officers are entitled to qualified immunity and to summary judgment on Count I.

### 2. Refusal of Medical Assistance Claim (Count II)

In Count II, Plaintiff asserts that Defendants Peifer and Hudson violated his constitutional rights by refusing to provide him with medical assistance for his low blood sugar. The Eighth Amendment protects prison inmates from deliberate indifference to their serious medical needs. *Pietrafeso v. Lawrence County*, 452 F.3d 978, 982 (8th Cir. 2006). Pretrial detainees and arrestees "are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *McRaven v. Sanders*, 577 F.3d 974, 979-80 (8th Cir. 2009); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012). "To establish deliberate indifference to serious medical needs, [Plaintiff] must show (1) an objectively serious medical need; and (2) the defendants actually knew of the need but deliberately disregarded it." *Flores v. United States*, 689 F.3d 894, 903 (8th Cir. 2012). An objectively serious medical need is one that has been diagnosed by a physician as requiring treatment or is so obvious that even a

layperson would easily recognize the necessity of a doctor's attention. *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014). For deliberate indifference to be found, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." *Pietrafeso*, 452 F.3d 98, 982-83 (8th Cir. 2006). (quotation marks omitted). "'Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed.'" *Id.* (quoting *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995)). However, "[a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions.'" *Id.* at 983 (quoting *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006)).

Here, nothing in the officers' conduct suggests that they knew that Plaintiff needed medical care and deliberately disregarded that need. Even assuming that the deputies knew early in their encounter with Plaintiff that he was having a hypoglycemic episode, it was entirely reasonable for the officers to remove Plaintiff from behind the wheel of his truck and subdue him, for their safety and that of Plaintiff and the public, before attending to his medical needs. *See Carpenter*, 686 F.3d at 650-51 (considering a deliberate indifference claim involving officers who were informed that a suspect was a possible stroke victim and stating, "Before the deputies could consider responding to [the plaintiff's] medical needs, they had to subdue him and secure the premises.").

The sole case cited by Plaintiff to support a finding of deliberate indifference, *Jones v. City of Cincinnati*, 521 F.3d 555 (6th Cir. 2008), is readily distinguishable. In *Jones*, officers subdued and handcuffed a suspect who had been resisting arrest, then left him face down on the ground with his hands cuffed behind his back. *Id.* at 558. While he was handcuffed, the suspect

stopped breathing, and all of the six officers who subdued him, along with three sergeants who later arrived on the scene, were aware that he had stopped breathing. *Id.* In addition, several of the officers and sergeants were aware that a suspect lying face down risks positional asphyxia (difficulty breathing due to one's posture or position). *Id.* Despite this knowledge, none of the officers or sergeants rolled the suspect over or provided any respiratory aid. *Id.* Instead, they merely summoned emergency medical services and stood around talking, and the suspect later died. *Id.* The Sixth Circuit found that the officers and sergeants were not entitled to qualified immunity on a claim of deliberate indifference, because each of them knew of a substantial risk of harm to the suspect's safety and disregarded that risk by failing to provide aid. *Id.* at 559-60.

Here, in contrast to *Jones*, there is no indication that the officers knew of and disregarded an obvious and immediate medical need. Plaintiff admits that as soon as Deputy Hudson and Deputy Peifer were able to gain sufficient control over Plaintiff to allow them to call EMS, EMS was called. EMS arrived and treated Plaintiff, and Plaintiff was taken to the hospital for further treatment. These facts make it clear that the officers were responsive to Plaintiff's medical needs and did not "deliberately disregard" them. Thus, Deputy Hudson and Deputy Peifer are entitled to judgment as a matter of law on Count II of Plaintiff's Complaint.

**B. ASSAULT AND BATTERY CLAIM AGAINST DEPUTY HUDSON AND DEPUTY PEIFER (COUNT V)**

In Count V, Plaintiff asserts common law claims of assault and battery against Defendants Peifer and Hudson.

In Missouri, the standard for determining whether a law enforcement officer is liable for assault and battery is different from the standard for determining whether a private individual is liable. *Washington v. Drug Enforcement Admin.*, 183 F.3d 868, 874 (8th Cir. 1999). A police officer may be liable for assault and battery only when the officer used more force than was

reasonably necessary in making an arrest.[11]  *See Neal v. Helbling*, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987).  In *Neal*, the court stated:

> An officer clothed with the warrant of law is answerable in damages as for assault and battery only when in the performance of his duty in making the arrest he uses more force than is reasonably necessary for its accomplishment.  This being true, it devolves upon the plaintiff to prove not only that the officer touched him in making the arrest, but that he used more force thereabout than was reasonably necessary to effect the arrest.  The burden of proof therefore is different in a case when the suit is against the officer acting under warrant than in those cases where it proceeds against a private individual.

*Id.* (quoting *State v. Hines*, 148 Mo. Ct. App. 289 (1910)).  This principle is not limited to situations in which an arrest is effected pursuant to a warrant.  *Id.*  "[T]he officer in the first instance is the judge of the manner and means to be taken in making an arrest.  Unless a plaintiff can show that unnecessary force was used, courts will protect the officer."  *Id.* (citing *Manson v. Wabash Railroad Company*, 388 S.W2d 54, 61 (Mo. 1960)).

As discussed above, the Court finds that the force used by the officers was objectively reasonable and not excessive.  For the same reasons that the officers are entitled to summary judgment on their excessive force claim, they are entitled to summary judgment on the state-law assault and battery claim.  *See Holtgreven*, 2009 WL 2032164, at *11 (holding that Plaintiff's claim of assault and battery under Missouri law failed for the same reasons as his excessive force claim under the Fourth Amendment failed: the plaintiff, a suspected intoxicated driver, posed a threat to public safety and to the officers; his subsequent act of resisting arrest necessitated the use of force; the officers only used force to the extent needed to subdue him; and once he was subdued, the officers did not use additional force).

---

[11] It is unclear at what point Plaintiff was "arrested"; the parties refer at various points to Plaintiff's "detention," "arrest," and "detention and/or arrest," but neither addresses when an arrest occurred.  However, both parties appear to accept that the *Neal v. Helbling* standard and Missouri's doctrine of official immunity apply to the assault and battery claim, and the Court will apply those standards here.

In addition, "[u]nder Missouri law, 'the doctrine of official immunity shields public officers and state officials from civil liability for injuries arising out of their discretionary acts, functions, or omissions performed in the exercise of their official duties.'" *Hawkins v. Holloway*, 316 F.3d 777, 788-89 (8th Cir. 2003) (quoting *Harris v. Munoz*, 43 S.W.3d 384, 387 (Mo. Ct. App. 2001)). Official immunity does not apply to discretionary acts done in bad faith or with malice. *Id.* "Bad faith or malice generally requires actual intent to cause injury." *Blue v. Harrah's North Kansas City*, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Id.* (internal quotation marks omitted). Bad faith "embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." *Id.* (internal quotation marks omitted). The official immunity doctrine "can also be overcome by showing conscious wrongdoing." *Id.*

As discussed above, the officers reasonably suspected that Plaintiff had been driving while intoxicated, and their detention of Plaintiff and subsequent use of force were objectively reasonable. Plaintiff offers no facts from which a reasonable jury could conclude that the officers here acted with the "actual intent to cause injury" to Plaintiff or engaged in any "conscious wrongdoing." Thus, Deputy Hudson and Deputy Peifer are also entitled to summary judgment on the basis of the official immunity doctrine.

### C. SECTION 1983 SUPERVISORY AND MUNICIPAL LIABILITY CLAIMS AGAINST JEFFERSON COUNTY AND SHERIFF BOYER (COUNTS III AND IV)

In Count III, Plaintiff asserts a supervisory liability claim against Sheriff Boyer under 42 U.S.C. § 1983, alleging that he failed to supervise, control, instruct, or train Deputy Hudson and

Deputy Peifer, leading to the deprivation of Plaintiff's constitutional rights. In Count IV, Plaintiff asserts a municipal liability claim against Jefferson County under 42 U.S.C. § 1983, alleging that Jefferson County's policies and customs, and/or its failure to supervise, control, instruct, or train Deputy Hudson and Deputy Peifer, led to the deprivation of Plaintiff's constitutional rights.

As both parties acknowledge, in order for municipal or supervisory liability to attach, individual liability first must be found on an underlying substantive claim. *See, e.g.*, *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) ("This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim"); *Carpenter v. Gage*, 686 F.3d 644, 651 (8th Cir. 2012) (holding that because deputies at the scene had not violated the Constitution, neither the sheriff nor the county could be liable for failure to train under section 1983); *Brockington v. City of Sherwood*, 503 F.3d 667, 673-74 (8th Cir. 2007) (holding that because the facts did not establish that a police officer was liable for the alleged underlying constitutional violation, neither his supervisor nor the county could be held liable under section 1983 for claims of failure to train or supervise or for unconstitutional policies or customs); *Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011) (affirming summary judgment on claims against a supervisor and a city for claims under section 1983 for failure to supervise and train an officer and for unconstitutional policies or customs; stating, "Because [the plaintiff] failed to establish that [the officer defendant] violated [the plaintiff's] constitutional rights, [the plaintiff] cannot maintain this action against either [the supervisor] or the city").

As discussed above, Plaintiff failed to establish that either Deputy Hudson or Deputy Peifer violated his constitutional rights. Thus, neither Jefferson County nor Sheriff Boyer can be held liable for the claims asserted against them under § 1983.

### V.    CONCLUSION

For all of the reasons stated above, Defendants have established that they are entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 50) is **GRANTED**. The Court will issue a separate judgment consistent with this Memorandum and Order.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of March, 2014.